UNITED STATES of America,
Plaintiff-Appellant,

v.

Nicholas Salvatore DiGIACOMO,
Defendant-Appellee.

No. 76–1954.

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 26, 1978.

Decided July 7, 1978.

C. Scott Crabtree, Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., Denver, Colo., with him on the brief), for plaintiff-appellant.

Peter H. Ney, Littleton, Colo., for defendant-appellee.

Before SETH, Chief Judge, and BARRETT and McKAY, Circuit Judges.

McKAY, Circuit Judge.

Defendant was indicted for possessing and passing counterfeit money with intent to defraud in violation of 18 U.S.C. § 472 (1976). The trial court granted a motion to suppress both a counterfeit bill seized from defendant and inculpatory statements made by defendant to government agents. The government appeals pursuant to 18 U.S.C. § 3731 (1976). We affirm.

At the suppression hearing the only evidence taken was the testimony of four Secret Service agents. Their testimony was generally consistent but conflicted in some crucial aspects. The agents told the court that defendant had been suspected of passing two counterfeit $100 bills which they had previously seized. Two of the agents, Wunderlich and Bulman, were watching for defendant at a restaurant in the early evening of July 26, 1976, when they saw him drive into the parking lot accompanied by a young lady. They approached him, identified themselves, said they wanted to talk about some counterfeit notes he had spent and asked if he would wait with them in the lot until two other agents arrived. Defendant complied with their request. The wait was approximately five minutes.

Wunderlich and Bulman testified that while they were waiting they did not separate defendant and the young lady but that they all waited together in one group. The other agents, Marsden and Simpkins, however, testified that when they arrived at the parking lot defendant and the young lady were separated from each other by some 25 to 30 feet and were each attended by one of the two agents already there. Neither Wunderlich nor Bulman advised defendant of his rights; yet Marsden stated that when he and Simpkins were contacted to come to the parking lot the other agents said defendant already was being interviewed by them. Wunderlich and Bulman denied they asked defendant anything except to wait in the lot.

After Marsden and Simpkins arrived, Simpkins advised defendant of some of his constitutional rights in the presence of Marsden and Wunderlich. The three each gave differing accounts of the advisement. Simpkins testified on direct and then reaffirmed on cross-examination he told defendant that

he had to understand his rights, that he had the right to remain silent, that any-

thing he said could be used against him in the court, and that he had the right to an attorney to be present during this time, and if he so chose not to have an attorney present, even during questioning, he could stop the interview at any time. Noticeably absent from Simpkins' recitation was any reference to a right to appointed counsel. Marsden described Simpkins' advisement by saying:

Mr. DiGiacomo was advised of his right to remain silent. He was advised that anything he said could be used against him in a court or other proceedings. He was advised that he may have an attorney present during the questioning, and that if he could not afford an attorney and wanted one, one may possibly be provided by the Court.

On cross-examination Marsden reaffirmed that in relation to court appointed counsel Simpkins said "possibly one would be appointed." Wunderlich's version of the advisement to defendant was that Simpkins

advised him that he had the right to remain silent, that anything he said could be used against him in a court of law, and that he had the right to have an attorney present at any time, and if he was unable to obtain the service of an attorney, that one would be provided at the expense of the Government.

When asked whether he understood his rights defendant responded affirmatively, said he had nothing to hide, and told the officers he had obtained the notes in a card game. Marsden showed defendant the two notes he was suspected of passing and asked if he had additional bills. Defendant said he might have one at home. He was told if he had any bills similar to the one at home, he would have to surrender them to the agents as contraband. Defendant then was asked if he would object to the agents examining any currency he was carrying. He said he had no objection and handed his cash to Marsden. The agent searched through the currency, found and seized a counterfeit $100 bill and returned the genuine currency to defendant.

The seriousness of the matter was explained to defendant and he was told it would be to his advantage to tell the agents the whole truth. Defendant asked to speak to Simpkins privately. Simpkins said he again advised defendant of his rights "exactly" as he previously had done, apparently leaving out any reference to appointed counsel. Defendant then made inculpatory statements to Simpkins. Marsden said they told defendant they could arrest him and take him to jail that night or he could make it easier on himself and avoid jail by cooperating and answering questions. The agent did not remember whether that was said before or after the note was seized. Simpkins claimed he did not remember that defendant was told he could go to jail that evening.

Later in the conversation defendant was told he could probably be charged with six felonies, each carrying possible penalties of 15 years imprisonment and a $5,000 fine. The agents promised defendant that if he cooperated in "setting up" his source, they would recommend that "consideration" be given defendant for his cooperation. Defendant was told he could be arrested that evening or he could appear "voluntarily" the next morning at the Secret Service office.

When defendant came to the agents' office the following morning he was read the *Miranda* warnings from an agency form. He signed an acknowledgement stating he understood his rights, but he refused to sign a waiver form until he could speak with his father. Defendant tried several times to call his father from the agents' office. When his father did not arrive after about an hour's wait, defendant was shown a photograph and asked if it was a picture of his source. Marsden testified defendant did not want to talk about the photograph but the agent asked him again to identify it. Defendant was silent and "was noticeably upset by the photograph," but "after some hesitation in studying the photograph, he acknowledged this was the person from whom he had purchased the counterfeit notes." The possibility of a "setup" was mentioned again. Defendant said he did

not want to discuss it further, the interview was terminated and defendant was allowed to leave.

In urging reversal of the suppression order, the government first argues the warnings specified in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were not necessary in this case and, alternatively, if they were required, the warnings given were sufficient to advise defendant of his rights.

### Necessity of Warnings

 Relying principally on *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the government contends defendant was not entitled to the *Miranda* warnings because he was not in custody during the interrogations. *Mathiason* is significantly different from this case. In *Mathiason* a police officer left his card at the defendant's apartment with a note asking him to telephone the officer "to discuss something." The defendant called and was requested to go to the patrol office. At the office he was told he was not under arrest, but that he was a suspect in a burglary case. He also was falsely told his fingerprints were found at the scene. After sitting quiet for a few minutes the defendant admitted taking the property. The officer then gave the defendant the *Miranda* warnings and took a taped confession. At the end of the half hour interview the defendant was told he would not be arrested at that time but was free to go. He then left the station. Based on this scenario the Supreme Court decided "that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.' " *Id.* at 495, 97 S.Ct. at 714 (quoting *Miranda v. Arizona*, 384 U.S. at 494, 86 S.Ct. 1602).

Although facts may vary from case to case, the principle articulated in *Mathiason* is the same: *Miranda* warnings are necessary whenever a defendant is "in custody 'or otherwise deprived of his freedom of action in any significant way.' " *Id.* Viewing the evidence in the light most favorable to the trial court's determination of the facts in this case, we conclude *Miranda* warnings clearly were required. Defendant was kept apart from his companion. He was confronted simultaneously by four federal agents. He was told he was suspected of passing counterfeit money. He was given only partial *Miranda* warnings. He was told he had to surrender any counterfeit money he possessed. He was told he could be arrested and jailed that evening. He was told he could choose between immediate arrest and "voluntary" appearance at the Secret Service office the following morning. The trial court was justified in holding that the agents' actions in the parking lot were "functionally equivalent to an arrest." As to the interrogation at the office the following day, the court found that defendant did not appear "voluntarily" but that he appeared "under threat of being arrested or going to jail." These findings have ample support in the record and are far from being clearly erroneous. We therefore hold that proper *Miranda* warnings were necessary.

### Adequacy of Warnings

 In reviewing the adequacy of the advisement in the parking lot, the trial court determined that the government failed to prove by a preponderance of the evidence that defendant was advised of his right to appointed counsel and his right to terminate questioning anytime. Insisting that *Miranda* imposes no obligation to expressly advise suspects they can terminate questioning, the government argues *Miranda* only requires that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. at 473–74, 86 S.Ct. at 1627. Although there may be no express requirement to warn suspects of the right to terminate questioning, the government's failure to so warn is certainly an important factor to be considered in determining the voluntariness of any statements made. Further, the right to appointed counsel is a significant right which cannot be excluded from the advisement.

■ The faulty advisement, coupled with the jail threats and order to surrender all counterfeit money, is more than sufficient to sustain the trial court's determination that the inculpatory statements were not rendered voluntarily. The government did not sustain its burden to prove defendant was given his constitutional due. *See Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

At the Secret Service office the next day adequate warnings were given. The required advisement was read to defendant. He then read it and signed an acknowledgement stating he understood what he had read. Defendant, however, refused to sign a waiver form and was reluctant to respond to questions. After considering the "totality of the circumstances," the trial court found the agents interrogated defendant when he had not waived his rights.

In disputing this conclusion the government stresses that defendant never requested an attorney and never indicated that his refusal to sign the waiver form was because he wanted an attorney. The Supreme Court firmly rejected this argument in *Miranda:*

> An individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. *No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given.*
>
> . . . . .
>
> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois,* 378 U.S. 478, 490, n. 14, [84 S.Ct. 1758, 12 L.Ed.2d 977]. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst,* 304 U.S. 458, [58 S.Ct. 1019, 82 L.Ed.

1461] (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

> An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

*Miranda v. Arizona,* 384 U.S. at 470, 475, 86 S.Ct. at 1626, 1628 (emphasis added). *See Sullins v. United States,* 389 F.2d 985, 988 (10th Cir. 1968).

■ We will not presume a waiver of a defendant's right to counsel, and the government did nothing to sustain its "heavy burden" of proving a waiver was "specifically made after the warnings" were given, as required by *Miranda.* Further, once defendant specifically refused to sign the waiver form, proof of waiver could be made only by the strongest evidence. Here the agent not only obtained no waiver, but he continued to interrogate after he knew "defendant did not want to talk about the photograph." The suppression of the statements made at the Secret Service office was proper.

### Constitutionality of Seizure

■ We turn finally to the issues surrounding the seizure of the counterfeit note. The government contends there was no search involved in the seizure. In response we merely note that an examination of the contents of a person's pocket is clearly a search, whether the pocket is emptied by the officer or by the person under the compulsion of the circumstances.

■■ The government also contends defendant consented to the seizure. A search and seizure may be made without a warrant or probable cause if the subject gives consent, but the government bears the burden to prove that the consent given validly waived the subject's Fourth Amendment rights. This court recently restated the standard for testing the voluntariness of consent in *United States v. Abbott*, 546 F.2d 883, 885 (10th Cir. 1977):

> (1) There must be clear and positive testimony that consent was "unequivocal and specific" and "freely and intelligently" given; (2) the government must prove consent was given without duress or coercion, express or implied; and (3) the courts indulge every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived.

The issue of the validity of a consensual search is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In our review of this issue, we view the evidence in the light most favorable to the trial court's determination.

■■ Although defendant said he did not object to the agents examining his currency, before the agents asked to see his cash they told him he was suspected of a serious crime, gave him a faulty recitation of his constitutional rights, told him he could be jailed that night, and told him he had to surrender all the counterfeit money he had. Based on this evidence the trial court was justified in concluding that the government had not sustained its burden. There was no "clear and positive testimony" or any "convincing evidence that [defendant's Fourth Amendment] rights were waived." *United States v. Abbott*, 546 F.2d at 885.

The decision of the trial court is affirmed.

BARRETT, Circuit Judge, dissenting:

In my view the district court's order granting DiGiacomo's motion to suppress a confession and evidence obtained incident to unlawful questioning is clearly erroneous as a matter of law.

The only witnesses called at the suppression hearing were the four Secret Service agents involved in the ongoing counterfeit currency investigation. The activities complained of occurred on July 26 and 27, 1976. The first incident, which took place on July 26, involved the parking lot contract made by two of the Secret Service agents with DiGiacomo and his girlfriend. The parking lot was adjacent to a restaurant. In my view, this encounter was such that the trial court was clearly erroneous in finding that the ensuing interrogation of DiGiacomo was "custodial" within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in light of the facts and circumstances related in *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In *Mathiason* the defendant responded voluntarily to a police officer's request that he report to the police station at a particular time for questioning about a burglary. The defendant had been singled out to the police officer as having committed the offense. The Court observed that even though the police officer informed Mathiason upon his arrival at the police station that he was not under arrest, nevertheless, Mathiason was believed to be the party who had committed the burglary. The police officer then falsely informed Mathiason that his fingerprints had been found at the scene. The Supreme Court held that these facts and circumstances did not render the ensuing one-half hour interrogation "custodial" in nature. The defendant's confession was not deemed inadmissible in evidence because there ". . . is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way." Significantly, the Supreme Court rejected the holdings of the lower courts that the interrogation took place in a "coercive environment" which deprived the defendant of "freedom of action in any significant way." The Supreme Court said:

> Such a noncustodial situation is not converted to one in which *Miranda* ap-

plies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda warnings are required only where there has been a restriction on a person's freedom as to render him "in custody."*

429 U.S., at p. 495, 97 S.Ct., at p. 714.

It is clear to me that the facts of the instant case fit within the "four corners" of *Oregon v. Mathiason, supra.* There is no evidence in the record before us that the Secret Service agents, who suspected DiGiacomo of passing two counterfeit $100.00 bills, did other than *request* that he remain in the parking lot until the other two agents arrived to talk to him about some counterfeit money. The agents who first approached DiGiacomo testified that DiGiacomo was not questioned until the other two agents arrived on the scene about five minutes later. Thus, there is nothing in the record evidencing that DiGiacomo was "deprived of his freedom of action in any significant way." And any reliance on "coercive environment" is dispelled by *Mathiason.* This approach applies with equal force to DiGiacomo's presence in the Secret Service agents' office on the morning of July 27.

Turning now to trial court's finding that the *Miranda* advisements given DiGiacomo were improper and inadequate, thus rendering his confession and the fruits thereof inadmissible, I must conclude that the finding is clearly erroneous.

The record reflects that all of the *Miranda* warnings and/or advisements were given, with the possible exception that DiGiacomo was entitled to appointed counsel if he could not afford to employ counsel of his choice. The remarks of the agents made to DiGiacomo that it would be to his advantage to tell the whole truth, that they could arrest him and take him to jail that night and that he could make it easier on himself by cooperating and answering questions came after the *Miranda* advisements. Certainly, within the factual setting of *Mathiason, supra*, this questioning could not be classified as "coercive" or "overbearing."

In my view, the proper rule to be applied in the challenge to the admissibility of a confession or other inculpatory statement is that enacted by the Congress of the United States, incorporated in the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.A. § 3501.[1] This court has recognized

---

1. § 3501. Admissibility of confessions

(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is *voluntarily given.* Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was

the applicability of § 3501. In *United States v. Crocker*, 510 F.2d 1129 (10th Cir. 1975), we stated that § 3501, commonly referred to as the "Post *Miranda* Act," was enacted for the purpose of offsetting the "harmful" effects of certain court decisions relating to the admissibility of confessions, including the *Miranda* decision. In *United States v. Brown*, 540 F.2d 1048 (10th Cir. 1976), cert. denied, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); *United States v. McCormick*, 468 F.2d 68 (10th Cir. 1972), cert. denied, 410 U.S. 927, 93 S.Ct. 1361, 35 L.Ed.2d 588 (1973); *United States v. Tafoya*, 459 F.2d 424 (10th Cir. 1972) and *United States v. Davis*, 456 F.2d 1192 (10th Cir. 1972), this court held—consistent with § 3501, *supra*,—that the inquiry in all such cases goes to the *voluntariness* of the confession and that the test of voluntariness is whether the incriminating statements were in any way coerced so as not to be the product of the free, independent will of the confessor.

The Congress and this court, in my view, have properly recognized the applicability of § 3501, *supra*, as being in the overriding interest of effective administration of the criminal justice system in meeting the needs of society. *See: Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). We have realistically recognized, as has the Congress, that if incriminating statements are made by a defendant voluntarily and without coercion, they are thus obtained without violating the covenants of the Fifth Amendment. The simple violation of one of the mechanical *Miranda* admonishments—as here—is no warrant for automatic suppression. Rather, the measure in making the *voluntariness* conclusion must be that of considering *all* of the facts and circumstances surrounding the making of admissions or confessions. *United States v. Tafoya, supra* at 426.

Mr. Justice White, writing for the majority of the Supreme Court in *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), favorably referred to 18 U.S.C. § 3501(a) relating to the test of voluntariness of a confession in federal criminal prosecutions. In *Michigan v. Tucker, supra*, Tucker was arrested for rape and questioned after being advised of his *Miranda* rights, except his right to appointment of counsel if he was indigent. The Court held that the police conduct, although failing to afford Tucker the *full measure* of the procedural safeguards enunciated in *Miranda*, did not deprive Tucker of his Fifth Amendment privilege. Pointedly, we believe, the Court referred to the *Miranda* rules as "a set of specific protective *guidelines*" and as "a series of *recommended* 'procedural safeguards'" and further that they were not intended "to create a constitutional straitjacket but rather to provide practical reinforcement for the right against compulsory self-incrimination." 417 U.S. at 441, 443 & 444, 94 S.Ct. at 2363, 2364. And in a concurring opinion in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, Mr. Justice White, after speculating that in the final analysis the majority of the Court would adopt voluntariness as the standard by which to judge the waiver of the right to silence by a properly informed defendant, observed:

> . . . The majority seems to say that a statement obtained within some unspecified time after an assertion by an individual of his 'right to silence' is always inadmissible, even if it was the result of an informed and voluntary decision—following, for example, a disclosure to such an individual of a piece of information bearing on his waived decision which the police had failed to give him prior to his assertion of the privilege but which they gave him immediately thereafter . . . I do not think the majority's conclusion is compelled by *Miranda* . . . I suspect that in the final analysis the majority will adopt voluntariness as the standard to judge the waiver . . .
>
> 423 U.S., at 107, 108.

without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into considera-

tion by the judge need not be conclusive on the issue of voluntariness of the confession. (Emphasis supplied.)

The Supreme Court has not been called upon to rule on the constitutionality of 18 U.S.C. § 3501(b). To be sure, the Supreme Court is the final and ultimate arbiter of any constitutional issue raised involving its applicability. That, however, is no reason for this court to "bury its head in the sand" in avoidance of the provisions of § 3501, *supra*.

The Congress, in obvious recognition of society's needs in the area of effective administration of the criminal justice system, enacted § 3501, *supra*, in order to vitalize the "totality of the circumstances" rule which, in my judgment, is both common sensed and fair. It *does not* abolish the *Miranda* guidelines, but instead it places them in proper focus based upon the totality of all of the facts and circumstances surrounding the confession or admission against one's Fifth Amendment interest. It avoids a mechanical, unrealistic application of *Miranda*.

In the instant case there is no dispute that DiGiacomo was advised of his right to remain silent, that anything he said could be used against him in court, and that he had a *right* to an attorney at that time or any future time. Two of the Secret Service agents testified that he was advised of his right to appointed counsel if he could not afford an attorney and if he wanted one. DiGiacomo stated that he understood these rights.

I submit that the *right* to an attorney clearly conveys just what it says: One has a right to an attorney if he so desires. Nothing in the record indicates that the defendant did not understand this. I, therefore, agree with this language employed by Chief Justice Burger in his dissent in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977):

> This, in cases where incriminating disclosures are voluntarily made without coercion, and hence not violative of the Fifth Amendment, but are obtained in violation of one of the *Miranda* prophylaxes, suppression is no longer automatic. Rather, we weigh the deterrent effect on unlawful police conduct, together with the normative Fifth Amendment justifi-

cations for suppression, against "the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce. . . . We also 'must consider society's interest in the effective prosecution of criminals. . . .'" *Michigan v. Tucker, supra,* 417 U.S. at 450, 94 S.Ct. 2357. This individualized consideration or balancing process with respect to the exclusionary sanction is possible in this case, . . . .

430 U.S., at 424, 97 S.Ct., at 1252.

I submit that the "individualized consideration or balancing process" with respect to the exclusionary sanctions weighs heavily in favor of the admissibility of the DiGiacomo incriminating disclosures and the evidence obtained incident thereto.

In my opinion the advisements given DiGiacomo were, under the totality of the facts and circumstances of the encounters involved, such as to adequately protect his Fifth Amendment rights against self-incrimination.

I would reverse and remand for further proceedings consistent with the views herein expressed.