**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Fernando OBREGON,
Defendant-Appellant.**

No. 83–2464.

United States Court of Appeals,
Tenth Circuit.

Nov. 13, 1984.

David N. Williams, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., and Larry Gomez, Asst. U.S. Atty., Albuquerque, N.M., with him on briefs), for plaintiff-appellee.

Nancy Hollander of Freedman, Boyd & Daniels, P.A., Albuquerque, N.M., for defendant-appellant.

Before BARRETT and DOYLE, Circuit Judges, and BOHANON,* District Judge.

BARRETT, Circuit Judge.

Fernando Obregon (Obregon) appeals from a judgment and probation/commitment order rendered after Obregon entered a conditional plea of guilty pursuant to Rule 11(a)(2), Fed.Rules Cr.Proc., 18 U.S.C.

Obregon pled guilty to possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952(a)(3). Within his conditional plea Obregon reserved the right to appeal the district court's adverse rulings on his motions to suppress statements, physical evidence, oral or written statements, and his motion to dismiss. The parties stipulated that Obregon would be allowed to withdraw his guilty plea if he prevailed on appeal. A summary of the relevant facts will facilitate our review.

On July 3, 1983, Obregon was driving a rented 1983 Mercury westbound on Interstate 40 when he was stopped at a roadblock set up by the New Mexico State Police near Moriarty, New Mexico. The roadblock had been established to conduct routine driver's license and car registration checks, and to afford training to two members of the New Mexico Mounted Patrol, an auxiliary of the New Mexico State Police.

After Obregon stopped, he was approached by Officer Faison. Upon determining that Obregon was driving a rented car with expired license plates and that Obregon's name was not on the car rental contract, Officer Faison, concerned that the car might be stolen, requested that Obregon park the car on the shoulder of the interstate. Officer Faison then advised Obregon that they were having a training roadblock and that he wanted to search the car. Obregon gave his oral and written consent. Officer Faison then searched the car and removed a garment bag. Upon opening the garment bag, Officer Faison discovered clothing and personal items and a tape-sealed cardboard box. Officer Faison opened the box and discovered three separate bags of cocaine inside.

Upon discovering the cocaine, Officer Faison placed Obregon under arrest and advised him of his *Miranda* rights. Obregon stated that he did not wish to make a statement and that he wished to speak with a lawyer. Officer Faison subsequently took Obregon to the New Mexico State Police Office in Moriarty. While at the Moriarty office, Officer Faison was joined by Narcotics Agent Bustamonte who conducted a field test of the cocaine and took custody of the box and cocaine. Agent Bustamonte, accompanied by Agent Wallsmith, met with Obregon for the purpose of obtaining written confirmation that he had in fact been advised of his rights. Agent Bustamonte read Obregon his rights from a written form.[1] Obregon then waived his right to counsel and right to remain silent

---

* The Honorable Luther L. Bohanon, Senior Judge for the Northern District of Oklahoma, sitting by designation.

1. Appendix A.

by signing the form. Thereafter, Obregon gave Agent Bustamonte a statement of the circumstances under which he had been transporting the cocaine.

Prior to trial Obregon moved to suppress the physical evidence seized at the time of his arrest and the statements he made to Agent Bustamonte. After a hearing, the court denied Obregon's motions, finding that Obregon had voluntarily consented to the search of the car he was driving and that Obregon had made an effective waiver of both his right to remain silent and his right to consult an attorney. The court also denied Obregon's subsequent motions to reopen the suppression hearing, to suppress oral and written statements, and to dismiss. In so doing, the court reiterated its prior findings that Obregon had voluntarily consented to the search of the rental car and its contents. The court also found that Obregon's motion to suppress the statements of Agent Bustamonte was not timely filed in accordance with Rule 12(c). Finally, in denying Obregon's motion to dismiss, the court found that the Government's inability to locate the cardboard box containing cocaine found in Obregon's garment bag did not prejudice Obregon to the extent that the case should be dismissed.

Following the court's disposition of Obregon's pretrial motions, and prior to the commencement of trial, Obregon entered a conditional plea of guilty, reserving the right to appeal the court's adverse rulings on his pretrial motions. On appeal, Obregon raises six allegations of error, posited as follows: (1) the defendant had a legitimate expectation of privacy in the vehicle he was driving and in his possessions within that vehicle; (2) the detention of the defendant in this case was not supported by reasonable suspicion; (3) the Government did not prove that the defendant consented to the searches and seizures; (4) even if the defendant voluntarily consented to the search, this consent did not overcome the taint of the unlawful detention; (5) the defendant's statements obtained after he invoked his right to counsel must be suppressed; and (6) the destruction of evidence, material to the defense, denied the defendant a fair trial.

## I.

Obregon contends that he had a legitimate expectation of privacy in the vehicle he was driving and in his possessions within that vehicle, and therefore had Fourth Amendment standing to challenge the propriety of the search of those possessions. Obregon cites to *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) and *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) for the proposition that he had a legitimate expectation of privacy in the rented car he was driving at the time of his arrest even though his interest in the rented car may not have been a recognized property interest at common law.

In finding that Obregon did not have standing to challenge the stop and subsequent search of the car on Fourth Amendment grounds, the district court relied upon *Rakas v. Illinois* for the basic propositions that Fourth Amendment rights are personal rights which cannot be vicariously asserted and that a defendant's legitimate expectation of privacy must be determined in light of the facts and circumstances of each case. The district court found specifically:

> Defendant had the keys to the car and may have had permission from the renter of the car to use it, but this is not determinative of the standing inquiry in this case. Defendant was driving a rented vehicle and was not named on the rental agreement or any other documents, either as the renter or as an authorized driver. Defendant made no showing that any arrangement had been made with the rental car company that would have allowed him to drive the car legitimately. Indeed, the defendant testified that he waited outside of Miami airport while an unrelated third party arranged the rental of the car. Defendant's relationship to the rented car is too attenuated to support a claim of standing. (R., Vol. I at pp. 55–56.)

Although counsel have not cited, and our own research has not produced, any opinion directly on point, i.e., whether a defendant

in sole possession and control of a car rented by another whom he claims to have voluntarily delivered the car to him has standing to challenge a search or seizure of the car, we believe the district court's findings are supported by our recent decision in *United States v. Erickson*, 732 F.2d 788 (10th Cir.1984).

In *Erickson*, the defendant, Sidney Erickson, who had keys to an airplane and had left it at Monarch Aviation in Grand Junction, Colorado, on May 6, 1983, challenged the district court's finding that he did not have standing to object to the installation of a transponder in the airplane, downed in New Mexico on May 9, 1983. During trial, Erickson testified that the plane, formerly owned by Emery Air Freight, had been sold by an aircraft broker to Armadillo Air Ambulance, a partnership between Erickson and one Jake Volley. Erickson submitted affidavits and "other papers" supportive of his alleged ownership in the plane. After hearing Erickson's testimony and after reviewing all the evidence introduced by Erickson, the trial court found that Erickson's testimony was not credible. The court found/concluded that Erickson did not have standing to challenge the installation of the transponder. In upholding the district court we held:

> Defendant was given every opportunity to establish his claimed partnership in the plane ... the trial court found that his testimony in that regard was not credible. In such a situation we are bound by the trial court's determination unless it is clearly erroneous ...

> . . . . .

> Looking to defendant's claim that his possession gave him standing, the judge noted that there was no tie between defendant and Emery Air Freight, and stated, "That leaves unexplained the circumstance wherein this defendant was in possession of the airplane on May 6, 1983 and therefore, he has failed to show that he had a reasonable expectation of privacy." Tr. 113.

In *Rakas v. Illinois*, 439 U.S. 128, 143–144 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58

L.Ed.2d 387, the Supreme Court stated that,

> "... one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude."

The question, then, is whether Erickson sufficiently showed lawful possession or control to confer standing.

No testimony showed that the defendant had anything to do with Emery Air Freight or that he was authorized by Emery to possess, use, or fly the aircraft. Thus defendant failed to show lawful possession of the plane giving rise to a legitimate expectation of privacy. See *United States v. Parks*, 5 Cir., 684 F.2d 1078; *United Stats v. Bruneau*, 8 Cir., 594 F.2d 1190, 1192–1193, *cert. denied*, 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61.

732 F.2d at 790.

Applying *Erickson* to the facts herein, we cannot hold that the district court was clearly erroneous in finding that Obregon did not have a legitimate expectation of privacy in the car he was driving and therefore he did not have standing to challenge the stop and later search of the car by the New Mexico State Police. *See also United States v. McCulley*, 673 F.2d 346 (11th Cir.1982), *cert. denied*, 459 U.S. 852, 103 S.Ct. 116, 74 L.Ed.2d 102 (1982), in which the court held that two codefendants lacked standing to challenge the warrantless search of an unoccupied automobile rented by another codefendant; *United States v. McConnell*, 500 F.2d 347 (5th Cir.1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1327, 43 L.Ed.2d 424 (1975), holding that defendant had no standing to challenge the legality of search of a rental car being driven by a codefendant when the car was rented by codefendant on defendant's credit card.

## II.

Obregon contends that his detention in this case was not supported by reasonable suspicion and was, accordingly, in violation

of his Fourth Amendment rights. We disagree.

It is uncontested that Obregon was stopped at a roadblock established by New Mexico State Police Officers for the purpose of conducting routine driver's license and car registration checks and to train two members of the New Mexico Mounted Patrol, an auxiliary of the New Mexico State Police. In *United States v. Prichard*, 645 F.2d 854 (10th Cir.1981), *cert. denied*, 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981) we approved the same type of roadblock at the same location. As in this case, Officer Faison was the arresting officer. In upholding the legality of the roadblock in *Prichard*, we stated:

> In the instant case, the New Mexico state police were attempting to stop all westbound traffic on an interstate highway, insofar as was humanly possible. The decision not to stop trucks was reasonable under the circumstances, because, presumably, they had all been stopped at a port of entry. The purpose of the roadblock, i.e., to check drivers' licenses and car registrations, was a legitimate one. *If, in the process of so doing, the officers saw evidence of other crimes, they had the right to take reasonable investigative steps and were not required to close their eyes. See United States v. Merryman*, 630 F.2d 780, 782–85 (10th Cir.1980). Furthermore, allowing all the stopped cars through when traffic became congested was also reasonable and, in our view, non-violative of the rule of [*Delaware v.*] *Prouse*, [440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)]. In sum, the roadblock stop of the Ford Bronco was, under the described circumstances, constitutional (emphasis added).

645 F.2d at 856–857.

■■■ We hold that Obregon's initial stop at the roadblock and subsequent detention were proper and lawful. It is uncontested that Obregon was stopped at the roadblock by Officer Faison for the routine purpose of checking Obregon's driver's license and car registration. Obregon was detained only after Officer Faison became concerned that the car might be stolen after observing that the rental contract for the car named Domingo Ceballos as the lessee of the car and that Obregon was not listed on the contract as a designated driver. Furthermore, Obregon was unable to advise Officer Faison how to contact Ceballos to confirm that Ceballos had given Obregon permission to drive the car. Under these circumstances, Officer Faison acted properly and lawfully in detaining Obregon to ascertain his possessory rights to the car. Obregon's detention was supported by reasonable suspicion on the part of Officer Faison and was not in violation of Obregon's Fourth Amendment rights.

## III.

■■■ Obregon contends that the Government did not prove that he had consented to the search of the car he was driving. As mentioned previously, after Obregon was initially stopped, Officer Faison, out of concern that the car might be stolen, requested that Obregon park the car on the shoulder. Within two to three minutes Officer Faison obtained Obregon's oral and written consent to search the car. After a complete hearing on the motion to suppress, the district court found that Obregon had voluntarily given both oral and written consent to the search. The issue of whether an individual has voluntarily consented to a search is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). Upon review of this issue, we must view the evidence in the light most favorable to the district court's determination. *United States v. DiGiacomo*, 579 F.2d 1211, 1216 (10th Cir.1978). We hold that the evidence is adequate to support the district court's finding that Obregon voluntarily consented to the search. Officer Faison testified that Obregon told him to "go ahead and search it (the car)." (R., Vol. III at 25.) Furthermore, Obregon also testified that he told Officer Faison he could search the car "because that way I felt he would let me go or something." (*Id.* at 81.) Under these circumstances we hold that Obregon's conten-

tion that the Government did not prove he had voluntarily consented to the search is without merit. The district court's finding that there was consent to search is amply supported by the record. *United States v. Heath,* 580 F.2d 1011 (10th Cir.1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979). The assessment of the credibility of witnesses is a prerogative of the trial court, and not that of an appellate court, which never heard nor saw the witnesses. *United States v. Prichard, supra,* 645 F.2d at 857; *United States v. Petersen,* 611 F.2d 1313, 1317 (10th Cir.1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980).

### IV.

█ Obregon contends that even if he did voluntarily consent to the search, that consent did not overcome the taint of his unlawful detention. As set forth in II *supra,* Obregon was lawfully detained after he was initially stopped at the roadblock. Thus, Obregon's detention in no way violated the efficacy of his consent to the search. Furthermore, Officer Faison's actions in briefly detaining Obregon were consistent with *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), in which the Supreme Court acknowledged that "a policeman may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."

### V.

Obregon contends that his statements made to Agents Bustamonte and Wallsmith must be suppressed.

After Obregon was arrested and advised by Officer Faison of his *Miranda* rights, he advised Officer Faison that he did not want to make a statement and that he wanted to talk to an attorney. Obregon was then taken to the New Mexico State Police Office in Moriarty. Approximately one hour after Obregon arrived at the Moriarty Office, Agent Bustamonte arrived from Santa Fe. After talking to Officer Faison and completing a field test on the cocaine, Agent Bustamonte and Agent Wallsmith took Obregon into an office.

█ At the time Agent Bustamonte took Obregon into the office she was aware that Officer Faison had advised him of his *Miranda* rights. Agent Bustamonte was not aware, however, that Obregon had stated that he did not want to make a statement and that he wished to speak to a lawyer. Nevertheless, we must proceed on the predicate that Agent Bustamonte was fully aware of the fact that Obregon had stated that he did not want to make a statement and that he wanted to see a lawyer because "once a suspect has invoked the right to counsel, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect." *United States v. Scalf,* 708 F.2d 1540, 1544 (10th Cir.1983).

Agent Bustamonte testified in detail about her conversation with Obregon, during the course of which Obregon initialed his understanding of his *Miranda* rights and also executed a waiver of his rights on a form, Government's Exhibit Number 9, Appendix A attached hereto. Agent Bustamonte testified in pertinent part:

A. Okay. When we told—when we asked Mr. Obregon to step into the office, I asked him to have a seat. He sat down. Agent Wallsmith also sat down.

I advised Mr. Obregon that the reason that he was there was because he had been arrested for smuggling a narcotic substance.

I also advised Mr. Obregon that the reason that I had asked him to step into the office was because I was going to read him his rights and make sure that he understood them.

Q. Did you intend to take a statement from him?

A. No, sir, I did not. I took an Advice of Rights form from my briefcase and showed it to Mr. Obregon, and this I did simply because Officer Faison had advised me that he had verbally advised the subject of his rights. I wanted to have evidence or proof that he had been

advised of his rights and that he did understand them . . . .

Q. And how did you utilize that Advice of Rights form in advising the defendant in this case of his Miranda rights?

A. Okay. I sat it in front of him. Mr. Obregon was sitting at a desk. I sat this in front of him and I told him, "I would like for you to read each line on the Advice of Rights form. If you understand it, I would like for you to initial each line."

I also advised him that if he didn't understand them, that I wanted for him to let me know what he didn't understand, and that I would explain to him what he didn't understand so that he could—I could make sure that he knew his rights . . . .

A. When we got down to the waiver of rights, I explained to him—I told Mr. Obregon that I was not going to ask him any questions, but I did tell him that I was going to read him his waiver of rights so that he would not feel that I had left something out on the form.

At that point, Mr. Obregon asked me what would happen to him if he helped me and told me what I wanted to know. I advised Mr. Obregon that I could not do anything for him. I could not promise him anything, and I could not help him.

I told him that the only reason, again, that I was reading him that waiver of rights was so that he would feel I wasn't leaving something out.

Once again, Mr. Obregon asked me, he told me that he wanted to tell me what he knew. He also told me that he wasn't a smuggler, that he just wanted to put a few more bucks in his pocket, and he wanted to tell me what he knew . . . .

Q. What were your impressions of his intent to cooperate with you?

A. He wanted to talk to me. He wanted—he wanted to tell me something. He wanted to say either what was on his mind, or how he felt, or what he wanted to do. He wanted to talk to me, even though I had told him that I was not going to ask him any questions and I didn't want a statement. He kept telling me that he wanted to tell me what he knew.

Q. And did you tell him that you didn't want to talk to him?

A. Yes, sir, I did.

Q. And after this had occurred, did you proceed to the waiver portion?

A. I then explained to him that I would then go ahead and read him his waiver of rights and that I wanted him to sign it. I told him, "If you, in fact, want to talk to me," I told him, "you need to sign this for me."

And he went ahead and signed it. And then I witnessed it, and Agent Wallsmith also witnessed it.

R., Vol. II at 124–28.

After signing the form, Obregon told the agents that he had received the cocaine from a person in Miami and that he was supposed to deliver it to an unknown person in California.

Obregon also testified in detail relative to his conversation with agents Bustamonte and Wallsmith. During cross-examination, Obregon testified in pertinent part:

Q. And you executed that document after a police officer had read you your rights; isn't that correct?

A. Yes, sir.

Q. And you were already, at that time, well aware that you were under arrest?

A. Yes, sir.

Q. But in any event, after being read that, you signed it and then you gave another statement, did you not?

A. Yes, sir.

Q. And it is also true, is it not, Mr. Obregon, that you gave the statement hoping to make a deal; isn't that what you told the woman?

A. No. They mentioned that, that they couldn't help—I got the idea that it could help.

Q. How did you get that idea?

A. It was obvious while it was happening, and I was confused at the time.

Q. But in any event, you did that voluntarily?

A. Yes, sir.

Q. Thinking that it would help you?

A. Yes, sir.

Q. And, in fact you signed a document saying that you waived your right to a lawyer; isn't that correct?

A. Yes, sir ....

Q. Let me ask you this: we have been talking about a statement that you gave to a woman policeman [Agent Bustamonte]. Do you recall that?

A. Yes, sir.

Q. And she read you these rights and told you certain things, did she not?

A. Yes, sir.

Q. And you signed a form [Appendix A], did you not?

A. Yes, sir.

Q. And then you talked to her; isn't that correct?

A. Yes.

Q. About what had happened?

A. Yes.

Q. And during the course of her reading this form to you, she kept telling you that she was not going to ask you any questions; isn't that correct?

A. That she wasn't going to ask me any questions?

Q. Yes.

A. She may have.

Q. Nevertheless, you told her about what had happened?

A. Basically.

Q. And if I understand your testimony correctly, the reason you did that was to try to help yourself?

A. Basically, yes.

R., Vol. III at 83–6.

On appeal, Obregon contends that his statement to Agents Bustamonte and Wallsmith was unlawfully coerced and should be suppressed. Obregon cites to *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), for the proposition that once a defendant has invoked his right to have counsel present during a custodial interrogation, the defendant may not be subject to further interrogation unless he initiates the communication. In *Edwards* the Court opined:

Second, although we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, see *North Carolina v. Butler, supra* [441 U.S. 369] at 372–376 [99 S.Ct. 1755 at 1756–1759, 60 L.Ed.2d 286 (1979)], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484–85, 101 S.Ct. at 1884–85 (footnote omitted).

The *Edwards* Court held Edwards' statement inadmissible because he had not personally initiated further communications, exchanges or conversations with the police:

Here, the officers conducting the interrogation on the evening of January 19 ceased interrogation when Edwards requested counsel as he had been advised he had the right to do. The Arizona Supreme Court was of the opinion that this was a sufficient invocation of his *Miranda* rights, and we are in accord. It is also clear that without making counsel available to Edwards, the police returned to him the next day. This was not at his suggestion or request. Indeed, Edwards informed the detention officer that he did not want to talk to anyone. At the meeting, the detectives told Edwards that they wanted to talk to him and again advised him of his *Miranda* rights. Edwards stated that he would talk, but what prompted this action does not appear. He listened at his

own request to part of the taped statement made by one of his alleged accomplices and then made an incriminating statement, which was used against him at his trial. We think it is clear that Edwards was subjected to custodial interrogation on January 20 within the meaning of *Rhode Island v. Innis, supra* [446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ], and that this occurred at the instance of the authorities. His statement, made without having had access to counsel, did not amount to a valid waiver and hence was inadmissible.

451 U.S. at 486–87, 101 S.Ct. at 1886 (footnote omitted).

The Court amplified on *Edwards* in *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In reversing the lower court's determination that Bradshaw had not initiated further conversation with police officers after he had requested to see an attorney, the Court opined:

At this point, respondent was placed under arrest for furnishing liquor to Reynolds, a minor, and again advised of his *Miranda* rights. A police officer then told respondent the officer's theory of how the traffic accident that killed Reynolds occurred; a theory which placed respondent behind the wheel of the vehicle. Respondent again denied his involvement, and said "I do want an attorney before it goes very much further." App. 72. The officer immediately terminated the conversation.

Sometime later respondent was transferred from the Rockaway Police Station to the Tillamook County Jail, a distance of some ten or fifteen miles. Either just before, or during, his trip from Rockaway to Tillamook, respondent inquired of a police officer, "Well, what is going to happen to me now?" The officer answered by saying "You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you have requested an attorney, you know, it has to be at your own free will." App. 16. See 54 Or.App. 949, 951, 636 P.2d 1011, 1011–1012 (1981). Respondent said he

understood. There followed a discussion between respondent and the officer concerning where respondent was being taken and the offense with which he would ·be charged. ...

In *Edwards* the defendant had voluntarily submitted to questioning but later stated that he wished an attorney before the discussions continued. The following day detectives accosted the defendant in the county jail, and when he refused to speak with them he was told that "he had" to talk. We held that subsequent incriminating statements made without his attorney present violated the rights · secured to the defendant by the ˙ Fifth and Fourteenth Amendments to the United States Constitution....

We think the Oregon Court of Appeals misapprehended the test laid down in *Edwards.* We did not there hold that the "initiation" of a conversation by a defendant such as respondent would amount to a waiver of a previously invoked right to counsel; we held that after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S., at 485 [101 S.Ct. at 1885]. This was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was. We recently restated the requirement in *Wyrick v. Fields,* 459 U.S. 42, 46 [103 S.Ct. 394, 395, 74 L.Ed.2d 214] (1982) (*per curiam*), to be that before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the "suspect himself initiates dialogue with the authorities."

462 U.S. at ———–———, 103 S.Ct. at 2833–2834.

 Applying these standards to the facts herein, we hold that Obregon initiated further communications with the police when he asked Agent Bustamonte what

would happen to him if he told her what she wanted to know. Furthermore, we agree with the trial court that, given the totality of the circumstances, when Obregon signed the form, he made a knowing and intelligent waiver of his right to counsel as required by *Edwards v. Arizona, supra,* and *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Under such circumstances, Obregon's statements need not be suppressed.

 We are satisfied that the action of Agent Bustamonte in taking Obregon into an office was solely for the purpose of obtaining written verification that he had been apprised of his constitutional rights. This, in our view, did not constitute the type of "custodial interrogation" violative of the rule in *Edwards v. Arizona.* Obregon's meeting with Agents Bustamonte and Wallsmith, although "custodial," was not "interrogation" because it did not constitute "words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

In *Oregon v. Bradshaw, supra,* the Supreme Court held that Bradshaw's statement, "Well, what is going to happen to me now?" initiated further conversation with the police officer, and that the police did not begin to interrogate him until after he had validly waived his right to counsel. Similarly, Obregon's question to Agent Bustamonte inquiring what would happen to him if he told her what she wanted to know initiated further conversation. Obregon testified, *supra,* that no deal or promises had been made to him and that he voluntarily signed the waiver form and subsequently made incriminating statements in the hope that it would help him. Thus, Obregon's subsequent statements to Agents Bustamonte and Wallsmith need not be suppressed under either *Edwards, supra,* or *Bradshaw, supra.*

 We wish to emphasize that our holding on this point is a narrow one and is confined to the facts of this case. Law

2. As set forth on Appendix A under "YOUR

enforcement officials may find it desirable in the future, in order to avoid the problem presented here, to utilize two distinct forms, one perhaps captioned "Advice of Rights" form setting forth one's rights under *Miranda*[2] with a signatory line for acknowledgment that he or she has read the statement of rights and understands same, and a second form perhaps captioned "Waiver of Rights" incorporating the text of Appendix A. This approach may eliminate any confusion existing between the concepts of "understanding rights" and "waiver of rights."

## VI.

 Obregon contends that the destruction of evidence, material to the defense, denied him a fair trial. Between the time of Obregon's arrest and Officer Faison's seizure of the cardboard box containing the cocaine and Obregon's trial scheduled herein, the Government lost the cardboard box. Obregon contends that the destruction of the box prejudiced his case because the box's appearance would have corroborated his story that he was unaware of the box's contents. Obregon's contentions in this regard were fully and carefully considered by the trial court in denying Obregon's motion to dismiss. We agree with the trial court's findings that although the box may have been cumulative evidence supportive of Obregon's defense, the box was not of such materiality that Obregon was denied a fair trial without it.

AFFIRMED.

## APPENDIX A

### INTERROGATION; ADVICE OF RIGHTS

#### YOUR RIGHTS

Place _____

Date _____

Time _____

Before we ask you any questions, you must understand your rights.

RIGHTS."

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

### WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed _____

Witness: _____

Witness: _____

Time: _____