******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., with whom McDONALD, J., joins, dissenting. The majority concludes that the defendant, Bernard A. Brandon, was not in custody during his first police interrogation for purposes of *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), even though the interrogation immediately followed a mandatory meeting with the defendant's probation officer, the interrogation was conducted by two armed police officers in a closed room inside a locked area of the probation building in which the defendant was not permitted to move about unescorted, and the police threatened to arrest the defendant if he refused to cooperate with their investigation. I cannot agree. In my view, the defendant's first interrogation took "place in a police-dominated atmosphere containing [inherent] pressures [that, by their very nature, tend] to undermine the individual's [ability to make a free and voluntary decision as to whether to speak or remain silent]"; (internal quotation marks omitted) *State* v. *Mangual*, 311 Conn. 182, 196, 85 A.3d 627 (2014); which is precisely the type of coercive environment that makes *Miranda* warnings necessary.

The fundamental flaw in the majority opinion is its failure to conduct the required analysis with due consideration for the single most important lesson of *Miranda* and its progeny, which is that modern interrogation techniques can purposefully and deliberately be employed —as they were in the present case—to create intense psychological pressure intended to overbear a suspect's will and to induce him to make self-incriminating statements. See, e.g., *Berkemer* v. *McCarty*, 468 U.S. 420, 433, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) ("[t]he purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing . . . [and] to relieve the inherently compelling pressures generated by the custodial setting itself, which work to undermine the individual's will to resist" (emphasis omitted; footnote omitted; internal quotation marks omitted)). The majority focuses far too narrowly on the supposed absence of physical restraints imposed on the defendant and correspondingly understates the very real psychological effect that the interrogating officers' pressure tactics had on the defendant. In the process, the majority loses sight of "the coercive pressure that *Miranda* was designed to guard against . . . ." *Maryland* v. *Shatzer*, 559 U.S. 98, 112, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010); see also *J. D. B.* v. *North Carolina*, 564 U.S. 261, 279, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011) (recognizing importance of "internal" or "psychological" impacts on suspect's perception in determining whether suspect is in custody for purposes of *Miranda* (internal quotation marks omitted)); *Arizona* v. *Fulminante*, 499 U.S. 279,

287, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) ("coercion can be mental as well as physical" (internal quotation marks omitted)).

In short, the majority's custody analysis loses sight of the primary and essential purpose that *Miranda* was designed to serve and the evils it was intended to prevent. That purpose is to protect prophylactically against the coercive pressures that often arise in the specific context of police interrogations. Custody is "the touchstone for application of [the *Miranda*] warning requirement"; *United States* v. *Newton*, 369 F.3d 659, 671 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004); not because it has independent constitutional significance in this context, but because the United States Supreme Court has identified it as "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes* v. *Fields*, 565 U.S. 499, 508–509, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012). Thus, *Miranda* warnings are not required only when a suspect has been placed under formal arrest, but also when the circumstances under which the interrogation occurs give rise to the "coercive pressure [that] is *Miranda*'s underlying concern . . . ." *United States* v. *Newton*, supra, 671; see *United States* v. *Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) ("[the] indicia of custody [factors] relate to the specific police practices employed during questioning [that] tend to either mitigate or aggravate an atmosphere of custodial interrogation"). Because I do not believe that the majority opinion fulfills the promise of *Miranda* and its progeny, I respectfully dissent.

The following facts are relevant to the analysis. The defendant was on probation at the time of his interrogation and, as a condition of his probation, was required "to cooperate with his probation officer[s]" and to "follow their directions . . . ." On February 16, 2016, the defendant attended a mandatory meeting with his probation officer, Shavonne Calixte, at the Office of Adult Probation located in Bridgeport (probation building). The probation building is a secure facility, guarded by uniformed judicial marshals. Visitors must pass through a metal detector and security checkpoint on the first floor to access the second and third floors, which are occupied by the probation department. The offices on the second and third floors are within locked areas, and probationers may enter only with the assistance of an escort.

The defendant met with Calixte in a reporting room on the third floor of the probation building. At the conclusion of their meeting, Calixte informed the defendant that, "if he had a moment, he can speak to someone else who would like to talk to him." Calixte did not tell the defendant who wanted to talk to him or that he had a choice to decline to attend the meeting.[1] Calixte escorted the defendant to the second floor, where she

was met by her supervisor, Chief Probation Officer Peter Bunosso.

Bunosso escorted the defendant to Bunosso's office, which was located within a locked and secured area. Two armed police officers, Lieutenant Christopher LaMaine and Detective Ada Curet, were waiting for the defendant inside. Bunosso did not advise the defendant that he did not have to attend the meeting or that he was not required to answer the police officers' questions. Indeed, Bunosso did not converse with the defendant at all. Instead, Bunosso removed some work files and closed the door behind him, leaving the defendant alone in a closed room with two armed police officers in a locked area of the probation building.

LaMaine and Curet were wearing plain clothes, with their badges and guns visibly displayed. The officers did not brandish their weapons or physically restrain the defendant, but they also did not tell him that he was free to leave at the beginning of the interrogation or advise him of his *Miranda* rights.

During the first twenty-one minutes of questioning, LaMaine informed the defendant that, on the basis of witness statements and the victim's cell phone records, the police knew that the defendant had engaged in a heated argument with the victim on the night of the murder and that the victim had called the defendant and arranged to meet him at an establishment called Robin's. LaMaine also told the defendant that security camera footage in the area depicted the defendant's vehicle driving to Robin's and stopping there for one and one-half to two minutes at the time that the victim was killed. Faced with this alleged evidence, the defendant confessed that he had had an argument with the victim, that the victim had called and asked to meet him at Robin's, and that the defendant had driven by Robin's at the approximate time of the shooting, but the defendant denied that he had stopped and talked to the victim. Thus, prior to being advised that he was not obligated to answer the police officers' questions or that he was free to leave, the defendant provided the police with strong evidence, out of his own mouth, that implicated himself in the victim's murder.

After the defendant's inculpatory admissions, LaMaine told the defendant for the first time that he could "walk away right now if [he] want[s]" and that "nothing [he] say[s] is going to get [him] arrested today . . . ." LaMaine also informed the defendant, however, that he was the prime, indeed the only, suspect in the victim's murder because he had been alone outside with the victim on the bitterly cold night that the victim was killed. According to LaMaine, the police had acquired security footage that portrayed the defendant driving away as the victim staggered out of a vehicle suffering from a gunshot wound.[2] LaMaine advised the defendant that now was the time for him to tell his version of

events because it would not be deemed credible if he waited until later. LaMaine told the defendant that he "can walk out right now" but cautioned that, "if you do, we gotta go on the facts we have. There's just the two of you there. We know that as a fact because this isn't June. This was a zero degree night. There's two of you, and, like I said, there's witnesses there. So, we can basically say that, you know, somehow he gets shot when it's just the two of you. Yeah, we're probably gonna be writing a murder warrant for you. And down the road, you might want to say, 'okay, well, I want to tell my side of the story, like he pulled a gun or something.' And not that you can't. You're gonna. But it's gonna not sound very credible because everybody when they're jammed up says, 'oh well, let me tell you, it was self-defense, or he pulled a gun.' Right, you know. Everybody does. So, we're saying, if that's what happened, tell us now because it's kind of credible now. We'll say [the defendant] was cooperative, he met with us voluntarily, he told us this, and we'll check it out. But, you know, later on you're gonna, you're gonna come up with that story later on. I know that. But it just won't be credible because, yeah, everybody comes up with it once they're arrested. So, we're not here to, you know, put any pressure on you. You're, like I said, free to go, you can walk out now. I think these guys, they don't have any questions for you. But, God, how does that look if you're us?"

LaMaine explicitly threatened to arrest the defendant soon thereafter. A few minutes after suggesting that it was now or never to give his version of events, LaMaine told the defendant that, "honestly, if we leave it like this, we're gonna write a murder warrant for you, and, if it was your buddy, because someone was with you, tell us. But you're by yourself. It's two of you. I got two guys that are hot, that . . . had a couple drinks, that agreed they're gonna meet, that are the only people there. And one of them was shot. How do you explain it? Try." When the defendant did not offer an explanation, LaMaine repeated the point again, saying that, "[i]f we leave here with this story, we're gonna write a murder warrant for you. Period." Curet added, "[w]e have no choice."

At this point in the interview, the defendant changed his story, explaining that he was not alone in the car, as he previously had stated, but was accompanied by a passenger named Outlaw, who shot and killed the victim. According to the defendant, Outlaw was in the passenger seat when he stopped at Robin's. Outlaw exited the car and spoke to the victim, shots were fired, and then Outlaw jumped back into the car. The defendant drove away and dropped Outlaw off on Connecticut Avenue in Bridgeport shortly after the shooting.

LaMaine and Curet pressed the defendant for details regarding Outlaw's identity, explaining that they had to

prove a case against Outlaw and that, if they could not do that, then the defendant was "the one going" and was not going to "walk . . . ." The defendant began searching his cell phone for Outlaw's contact information. The defendant provided LaMaine and Curet with Outlaw's phone number and physical description and informed them that Outlaw previously had been convicted in connection with a shooting. LaMaine and Curet continually questioned the credibility of the defendant's account of events for the next forty minutes, but the defendant maintained that Outlaw had been present at the scene and had shot the victim. At the conclusion of the interrogation, which lasted approximately ninety minutes from start to finish, LaMaine and Curet seized the defendant's cell phone and arranged to meet him at the police station later that evening to identify Outlaw from photographs.

The defendant subsequently was arrested and charged with the victim's murder, in violation of General Statutes § 53a-54a, among other crimes. Prior to trial, the defendant moved to suppress, among other things, the statements he made during the first interrogation, arguing in pertinent part that his statements were procured in violation of *Miranda*. The trial court denied the defendant's motion, finding that, although the defendant was subject to interrogation for purposes of *Miranda*, the defendant was not in custody because he was never handcuffed or physically restrained, the police officers did not brandish their weapons, the tone of the interrogation was cordial, and the defendant was informed multiple times that he was free to leave. The defendant's statements were admitted into evidence at his jury trial, and the defendant was convicted of the lesser included offense of manslaughter in the first degree with a firearm, in violation of General Statutes § 53a-55a (a).

The sole issue on appeal is whether the defendant was in custody during the first interrogation and, as such, entitled to *Miranda* warnings. As we previously have explained, the term "custody" in the context of *Miranda* and its progeny "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 193, quoting *Howes* v. *Fields*, supra, 565 U.S. 508–509. The custody inquiry is important "because the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements" and "heightens the risk that statements obtained therefrom are not the product of the suspect's free choice." (Internal quotation marks omitted.) Id., 191. The court in *Miranda* was concerned with protecting criminal defendants from "the incommunicado nature of [police] interrogations" and the concomitant "psychological pressure"; *United States* v. *LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004), cert. denied, 543 U.S. 1145, 125 S. Ct. 1292, 161

L. Ed. 2d 105 (2005); which "work to undermine the individual's will to resist and to compel him to speak [when] he would not otherwise do so freely . . . . By adequately and effectively appris[ing] [a suspect] of his rights and reassuring the suspect that the exercise of those rights must be fully honored, the *Miranda* warnings combat [the] pressures inherent in custodial interrogations . . . [and] enhance the trustworthiness of any statements that may be elicited during an interrogation." (Citations omitted; internal quotation marks omitted.) *State* v. *Mangual*, supra, 191; see *J. D. B.* v. *North Carolina*, supra, 564 U.S. 269 ("the physical and psychological isolation of custodial interrogation can undermine the individual's will to resist and . . . compel him to speak [when] he would not otherwise do so freely" (internal quotation marks omitted)).

Courts have struggled to define the "slippery" concept of custody. *Oregon* v. *Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). The federal cases since *Miranda* have articulated an objective, two part analysis, known as the "reasonable person test . . . ." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 193. First, the court must ascertain whether, "in light of the objective circumstances of the interrogation . . . a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave." (Citation omitted; internal quotation marks omitted.) Id., quoting *Howes* v. *Fields*, supra, 565 U.S. 509. Determining "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest"; (internal quotation marks omitted) *Maryland* v. *Shatzer*, supra, 559 U.S. 112; "is simply the first step in the analysis, not the last." *Howes* v. *Fields*, supra, 509. This is because the restraint on the suspect's freedom of movement does not, standing alone, demonstrate that the suspect is subject to the type of coercive "concerns that powered [*Miranda*] . . . ." Id., 514.[3] Thus, if the freedom of movement prong is satisfied, a court must examine the second prong of the reasonable person test, which asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *State* v. *Mangual*, supra, 193, quoting *Howes* v. *Fields*, supra, 509. "Only if the answer to this second question is yes was the person in custody for practical purposes . . . and entitled to the full panoply of protections prescribed by *Miranda*." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 194–95 n.12.

The majority states that I have "inappropriately collapse[d] the free to leave inquiry with the restraint to the degree associated with a formal arrest inquiry." Footnote 12 of the majority opinion. To the contrary, I am fully aware that the free to leave inquiry is only the first step in a two part analysis. The second part of the analysis, as I state in the preceding paragraph

and reference throughout this opinion, asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes* v. *Fields*, supra, 565 U.S. 509.[4] Indeed, the second part of the custody inquiry is critical to my analysis because it identifies precisely the issues that I believe are overlooked by the majority. As *Howes* and other cases explain, the second question is necessary because *Miranda* is concerned with a *particular kind of coercion*—the coercive pressures created by "interrogations that take place in a police-dominated atmosphere containing [inherent] pressures [that, by their very nature, tend] to undermine the individual's [ability to make a free and voluntary decision as to whether to speak or remain silent] . . . ." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 196. The second inquiry is necessary because the circumstances triggering *Miranda* will not necessarily be present merely because the interrogation is conducted in a location that coincidentally happens to restrict the suspect's freedom of movement. See footnote 3 of this opinion. *Miranda*, in sum, is implicated when the police have not formally arrested a suspect but nonetheless employ interrogation practices, whether physical or psychological, that deliberately generate the same kind of coercive pressures as would an actual arrest.

The in-custody inquiry is flexible and fact intensive. Indeed, we have emphasized that there is "no definitive list of factors" because the custody analysis must, by necessity, "be based on the circumstances of each case . . . ." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 196. That having been said, the analysis is conducted with attention "to those kinds of concerns" at the heart of *Miranda*, namely, *Miranda*'s "expressed concern with protecting defendants against interrogations that take place in a police-dominated atmosphere containing [inherent] pressures [that, by their very nature, tend] to undermine the individual's [ability to make a free and voluntary decision as to whether to speak or remain silent] . . . ." (Internal quotation marks omitted.) Id. We have identified the following nonexclusive list of factors (*Mangual* factors) to guide the custody analysis: "(1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." Id., 197.

It is vital to keep in mind that *Mangual* never intended

to formulate a rote checklist for mechanical application in every case. The foregoing factors are not exhaustive, and "a heavy focus on enumerated factors, or comparisons to other precedents, may eclipse the 'ultimate [custody] inquiry' before the court, which is case specific . . . ." *State* v. *Castillo*, 329 Conn. 311, 341, 186 A.3d 672 (2018) (*D'Auria, J.*, dissenting); see also *J. D. B.* v. *North Carolina*, supra, 564 U.S. 270–71 ("[r]ather than demarcate a limited set of relevant circumstances, we have required police officers and courts to examine all of the circumstances surrounding the interrogation . . . including any circumstances that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave" (citation omitted; internal quotation marks omitted)).

In my view, the majority's mechanical application of the *Mangual* factors obscures the proper analysis with respect to the defendant's custodial status.[5] For this reason, I see no need to respond point by point to the majority's conclusion regarding each factor, and doing so would serve only to replicate what I consider to be a flawed methodology. With respect to the factors that are relevant to this case, I believe the majority improperly assesses their weight and importance in deciding the ultimate issue, namely, whether a reasonable person in the defendant's position would have believed that his freedom of movement had been restrained to the degree associated with a formal arrest.

First, although the tone of the interrogation was cordial, the iron fist beneath the velvet glove was palpable. The interrogating officers made it clear that the defendant was the prime, if not the only, suspect in the victim's murder; indeed, they told him that his arrest was both inevitable and forthcoming unless he remained in the room and answered their questions. The United States Supreme Court has observed that an "officer's subjective view that the individual under questioning is a suspect . . . bear[s] [on] the question whether the individual is in custody for purposes of *Miranda*" if the information is "communicated or otherwise manifested to the person being questioned . . . ." *Stansbury* v. *California*, 511 U.S. 318, 324, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994). Although "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest," the communication of such information may "affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." (Internal quotation marks omitted.) Id., 325. Stated another way, in the present case, the officers' statements to the defendant that he was the sole and primary focus of their murder investigation "would have affected how a reasonable person in [the defendant's] position would perceive his or her freedom to leave."

Id.; see *United States* v. *Griffin*, supra, 922 F.2d 1348 ("[a]lthough custody is not inferred from the mere circumstance that the police are questioning the one whom they believe to be guilty, the fact that the individual has become the focus of the investigation is relevant to the extent that the suspect is aware of the evidence against him and this awareness contributes to the suspect's sense of custody" (internal quotation marks omitted)); see also *State* v. *Castillo*, supra, 329 Conn. 348 (*D'Auria, J.*, dissenting) ("[a]n officer stating that he believes that the suspect committed a crime and has evidence to prove it may lead a person in the suspect's position and hearing those allegations to conclude that the officer will not permit him to leave").

The pressure on the defendant to remain in the room and to answer the officers' questions was increased exponentially when LaMaine told him that, not only was he the prime suspect in the victim's murder, but a warrant for his arrest would be forthcoming if he did not provide his side of the story to the interrogating officers.[6] LaMaine's statements to the defendant were threats of arrest, plain and simple, and they must be considered as part of the in-custody analysis to determine whether the defendant was subjected to pressures that deprived him of a meaningful choice about whether to speak or remain silent. "[N]umerous courts have indicated that whether law enforcement officers threatened arrest or other penalties to induce cooperation is an important element to assess in evaluating whether a defendant was in custody." *United States* v. *Blakey*, 294 F. Supp. 3d 487, 494 (E.D. Va. 2018); see id., 494–95 (citing cases); see also, e.g., *United States* v. *DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir. 1978) (holding that defendant was in custody for *Miranda* purposes, in part because he "was told he could be arrested and jailed that evening" if he did not meet and cooperate with officers). Threats of arrest are relevant because "[o]ne of the primary concerns motivating the *Miranda* protections is the danger of coercion [that] results from the interaction of custody and official interrogation. . . . This danger is manifest, for instance, [when] the defendant feel[s] compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." (Citations omitted; internal quotation marks omitted.) *United States* v. *Blakey*, supra, 494; see also *Illinois* v. *Perkins*, 496 U.S. 292, 297, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) ("[q]uestioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the [c]ourt has assumed will weaken the suspect's will").

Second, although the defendant was not handcuffed or physically restrained, it is undisputed that his freedom of movement was severely restricted. The record does not reveal whether the door to the interrogation room was locked, but it is clear that the area of the building in which the defendant was questioned was

locked and that the defendant was not free to move about the building without an escort.[7] The fact that the defendant had been escorted to a restricted, locked and secured area, not accessible to the public, where he was left in the immediate control of armed police officers and then systematically questioned for ninety minutes about his alleged involvement in a recent murder, when considered in combination with the other factors discussed in this opinion, indicates that the defendant's freedom of movement had been restrained to the degree associated with a formal arrest. See, e.g., *United States* v. *Byram*, 145 F.3d 405, 409 and n.1 (1st Cir. 1998) (defendant "unquestionably [was] subject to deliberate custodial interrogation" because he was "already in custody, was taken to a separate room in the courthouse, left effectively in [a police officer's] immediate control, and then questioned systematically about his role in a criminal episode"); *United States* v. *Hartwell*, 296 F. Supp. 2d 596, 606–607 (E.D. Pa. 2003) (defendant was subject to custodial interrogation because he "was in a small private room, surrounded by two [Transportation Security Administration] agents and a police officer blocking the exit, and had just produced a suspicious item that he had been exceedingly reluctant to reveal"), aff'd, 436 F.3d 174 (3d Cir.), cert. denied, 549 U.S. 945, 127 S. Ct. 111, 166 L. Ed. 2d 255 (2006). As the Fifth Circuit Court of Appeals has explained, "[i]nterrogations in public settings are less [police-dominated] than [station house] interrogations; the public nature reduces the hazard that officers will resort to overbearing means to elicit incriminating responses and diminishes the individual's fear of abuse for failure to cooperate." *United States* v. *Chavira*, 614 F.3d 127, 135 (5th Cir. 2010); see *Berkemer* v. *McCarty*, supra, 468 U.S. 438 ("exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect's] fear that, if he does not cooperate, he will be subjected to abuse"). When a defendant is questioned by multiple police officers in a private, secured area, confronted with inconsistencies in his story, and accused "of being untruthful, all while [the officers] deliberately [withheld] *Miranda* warnings because [he] had not yet confessed to a crime," such questioning "bear[s] [all] the hallmarks of traditional custodial interrogation . . . ." *United States* v. *Chavira*, supra, 135.

Last, but by no means least, the defendant was a probationer, and the interrogation took place in a physical setting that highlighted the coercive nature of his probationary status. LaMaine and Curet initiated the interrogation at the probation building following the defendant's mandatory meeting with his probation officer. "[W]hen the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist." *United States* v. *Griffin*,

supra, 922 F.2d 1351. As the majority recognizes, the location of the interview, in the probation office, "provides some support for the defendant's contention that he was in custody." Further support can be found in the inherent psychological pressures faced by a suspect whose liberty already has been restricted by the constraints associated with probation and who faces further restraints, such as revocation of probation and incarceration, if he does not comply with the directives of his probation officer. See, e.g., *J. D. B* v. *North Carolina*, supra, 564 U.S. 279 (in determining whether suspect was in custody, court must consider "[the] 'internal' or 'psychological' impact on perception"); *United States* v. *Axsom*, 289 F.3d 496, 500 (8th Cir. 2002) ("[i]n deciding whether a person was 'in custody,' we must examine both the presence and extent of physical and psychological restraints placed [on] the person's liberty during the interrogation").

To understand the psychological pressures felt by a probationer in the defendant's position, I begin by reviewing the nature and function of probation, which is a penal status intended by design to be coercive. "[P]robation is, first and foremost, a penal alternative to incarceration . . . . [P]robationers . . . do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 180, 842 A.2d 567 (2004). Probationers are not in custody by virtue of their status; nor are they at liberty to exercise their will like free citizens. Probationers agree to a set of standard conditions of probation and, in some cases, additional conditions imposed by the probation officer or the court. For example, all probationers are instructed to "refrain from violating any criminal law of the United States, this state or any other state . . . ." General Statutes § 53a-30 (a) (7); see, e.g., *State* v. *Lopez*, 341 Conn. 793, 795–96, 268 A.3d 67 (2022). At times, the conditions of probation may require the probationer to "[s]ubmit to a search of [his] person, possessions, vehicle or residence when the [p]robation [o]fficer has a reasonable suspicion to do so." (Internal quotation marks omitted.) *State* v. *Moore*, 112 Conn. App. 569, 574, 963 A.2d 1019, cert. denied, 291 Conn. 905, 967 A.2d 1221 (2009). Additional conditions may also be imposed. See, e.g., *State* v. *Imperiale*, 337 Conn. 694, 707, 255 A.3d 825 (2021) ("the Office of Adult Probation properly may impose conditions of probation that place significant restrictions on a probationer's liberty during the term of his or her probation, if such restrictions are reasonably necessary"); *State* v. *Johnson*, 75 Conn. App. 643, 652, 817 A.2d 708 (2003) ("[p]ostjudgment conditions imposed by adult probation are . . . part of an administrative function that [§ 53a-30] expressly authorizes as long as it is not inconsistent with any previously court-imposed

condition"); see also General Statutes § 53a-30 (a) (17) ("the court may . . . order that the defendant . . . satisfy any other conditions reasonably related to the defendant's rehabilitation").

A probationer who is found to be in violation of probation may have his probation revoked and be ordered to serve the unexecuted portion of his sentence in jail. See, e.g., *State* v. *Fagan*, 280 Conn. 69, 105, 905 A.2d 1101 (2006) (observing that revocation proceeding may "requir[e] an end to the conditional freedom obtained by a defendant at a sentencing that allowed him or her to serve less than a full sentence" (internal quotation marks omitted)), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). The probation revocation hearing offers less protection to probationers than a criminal proceeding. See *State* v. *Faraday*, supra, 268 Conn. 183 ("[A probation] revocation proceeding . . . is not a criminal proceeding. . . . It therefore does not require all of the procedural components associated with an adversar[ial] criminal proceeding." (Internal quotation marks omitted.)); see also *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973) ("[p]robation revocation, like parole revocation, is not a stage of a criminal prosecution"). "This is because it is well established that a probation revocation proceeding is not a criminal proceeding but is instead more akin to a civil proceeding." (Internal quotation marks omitted.) *State* v. *Dudley*, 332 Conn. 639, 648, 212 A.3d 1268 (2019). At a revocation proceeding, the state must prove each alleged violation of probation only by a preponderance of the evidence (rather than beyond a reasonable doubt); see, e.g., *State* v. *Esquilin*, 179 Conn. App. 461, 470–71, 179 A.3d 238 (2018); and the rules of evidence do not apply to such proceedings. See Conn. Code Evid. § 1-1 (d) (4); see also *State* v. *Maietta*, 320 Conn. 678, 691, 134 A.3d 572 (2016) (recognizing that relevant hearsay evidence is admissible at probation revocation hearing within discretion of trial court); *State* v. *Jacobs*, 229 Conn. 385, 392, 641 A.2d 1351 (1994) (observing "that, unlike criminal trials, in which the exclusionary rule typically applies, in probation revocation hearings, the exclusionary rule typically does not apply").

In light of the restrictions imposed on a probationer's liberty and the severe repercussions for noncompliance with the conditions of probation, a probationer is likely to interpret any instruction or guidance from a probation officer as mandatory and feel pressured to comply with the officer's requests, even if they are not compulsory. See *Fare* v. *Michael C.*, 442 U.S. 707, 722, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979) (observing that probationers may develop "a relationship of trust and cooperation" with their officers); *People* v. *Elliott*, 494 Mich. 292, 315, 833 N.W.2d 284 (observing that "inherently compelling pressures" exist in relationship between parolee and parole officer and "that both parolees and

probationers are under heavy psychological pressure to answer inquiries made by their supervising officers" (internal quotation marks omitted)), cert. denied, 571 U.S. 1077, 134 S. Ct. 692, 187 L. Ed. 2d 559 (2013); *State v. Roberts*, 32 Ohio St. 3d 225, 230, 513 N.E.2d 720 (1987) (stressing heavy psychological pressure to answer questions posed by probation officer, who is figure of authority and trust).[8] In my view, a probationer in the defendant's position would have perceived Calixte's escorted trip to the office of her supervisor at the conclusion of his mandatory probation meeting as a compulsory requirement, rather than a voluntary option.

The majority concludes that the defendant voluntarily chose to attend the meeting in the office of Calixte's supervisor because he failed to produce any evidence that Calixte issued a direct order or threatened to initiate proceedings to violate his probation if he refused to attend. I see no reason why the defendant should be required to produce affirmative evidence of a direct order or threat to satisfy the in-custody requirement. The issue is not whether Calixte expressly ordered or threatened the defendant to coerce him to attend the interrogation but whether a reasonable person in the defendant's position would have perceived Calixte's request as an order under all of the surrounding circumstances, such that refusal to comply could result in violation of the defendant's probation. The record is devoid of any evidence that Calixte ever informed the defendant that there would be no adverse consequences if he declined to attend the meeting in her supervisor's office. Given the absence of such an advisement, the pervasive restrictions on liberty imposed by the conditions of probation, and the additional physical and psychological restraints operative in the probation building following the defendant's mandatory probation meeting, I believe that a reasonable person in the defendant's position would have perceived Calixte's request as a command. By focusing on the absence of evidence of an explicit order or threat, rather than on how Calixte's statements would have been perceived by a probationer in the defendant's position, the majority misapprehends the nuanced and fact intensive nature of the *Miranda* custody inquiry.[9]

Given that a reasonable person in the defendant's position would have believed that he was required as a condition of his probation to meet and cooperate with LaMaine and Curet, just as he was required to meet and cooperate with his probation officer under threat of revocation of probation, I find the analysis of the Eighth Circuit Court of Appeals in *United States* v. *Ollie*, 442 F.3d 1135 (8th Cir. 2006), to be instructive. In that case, the defendant, Johnny Lee Ollie, Jr., was on parole when he was instructed by his parole officer to meet with the police following his regularly scheduled parole meeting. Id., 1136. The court found that "Ollie neither initiated contact with the . . . police nor

voluntarily acquiesced to questioning." Id., 1138. The court reasoned that "Ollie's conduct revealed little more than an absence of resistance" and that it was "clear . . . that . . . Ollie was responding to pressure." Id. Because the failure to attend the meeting could have resulted in the revocation of Ollie's parole; id.; the court noted that "a reasonable person in . . . Ollie's position would have been extremely reluctant either to refuse the interview or to terminate it once it began." Id., 1140. This one factor, "[a]bove all else," led the court to conclude that the "the failure to advise . . . Ollie of his rights pursuant to *Miranda* requires the suppression of his initial oral confession . . . ." Id., 1140.

Similarly, in *United States* v. *Barnes*, 713 F.3d 1200 (9th Cir. 2013), the Ninth Circuit Court of Appeals held that the defendant, Michael D. Barnes, was in custody for purposes of *Miranda* because he "did not appear voluntarily but rather was told to appear for a meeting with his parole officer under threat of revocation of parole." Id., 1204. The meeting did not occur on its usual day or location in the lobby of the parole building but, rather, "Barnes was searched and escorted into the interior of the building through an electronically locked door." Id., 1203. Behind the locked door were "two [Federal Bureau of Investigation (FBI)] agents waiting to question [Barnes]" about a drug transaction. Id. "The FBI agents directly confronted Barnes with evidence of guilt [for approximately ten to twenty minutes] before administering the *Miranda* warnings." Id., 1204. The court determined that Barnes was in custody and entitled to *Miranda* warnings at the commencement of the interrogation, even though "he was not handcuffed, arrested, or physically intimidated in any way," because Barnes "was in a police-dominated, confined environment in which his presence was mandated by his parole terms . . . ." Id., 1204.

I find the logic and reasoning of *Ollie* and *Barnes* persuasive. The defendant did not voluntarily appear at the meeting with LaMaine and Curet and affirmatively consent to answer their questions. Instead, he was under extreme "pressure resulting from a combination of the surroundings and circumstances"; id., 1204–1205; not the least of which was the looming prospect of revocation of his probation if he refused to comply. Accordingly, the failure to issue *Miranda* warnings necessitates the suppression of the defendant's inculpatory admissions during his first interrogation.

The fact that LaMaine told the defendant that he was free to leave does nothing to alter my conclusion regarding the defendant's custodial status. Indeed, a more careful analysis of LaMaine's ostensibly liberatory comments demonstrates that they actually conveyed a strongly coercive message. To begin with, the defendant was not informed that he could "walk out" of the room until twenty-one minutes into the interrogation, after

he already had implicated himself in the victim's murder. This delay is significant.[10] The practice of questioning a suspect first, and then advising him that he is free to leave after eliciting a confession, is similar to the "question first" practice expressly denounced in the *Miranda* context in *Missouri* v. *Seibert*, 542 U.S. 600, 611–13, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (opinion announcing judgment). In *Seibert*, the United States Supreme Court held that the "police protocol for custodial interrogation that calls for giving no warnings of the rights to [remain silent] and [to] counsel until interrogation has produced a confession" was unconstitutional. Id., 604. The manifest intent of the question first practice "is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble." Id., 613. Midstream *Miranda* warnings typically are constitutionally ineffective because they fail "to convey a message that [the suspect] retained a choice about continuing to talk." Id., 617. Likewise, I believe that midstream advisements regarding a suspect's freedom to leave, after a confession already has been elicited through persistent questioning, fail to convey to a suspect that he has a choice regarding his participation in the interrogation.

Additionally, and perhaps most troubling, is the fact that LaMaine's statements regarding the defendant's freedom to leave were not without restriction—the defendant was told repeatedly that he was free to leave, *but, if he chose to do so, he would be arrested for the victim's murder.*[11] This is the very opposite of a voluntary choice: the defendant was explicitly advised that his only chance of avoiding arrest was to cooperate and tell the police his side of the story. The nature and extent of LaMaine's threats of arrest, which I have described in detail, are precisely the type of coercive interrogation tactic that is intended to overbear a suspect's will and to elicit a confession. See, e.g., *United States* v. *Johnson*, 351 F.3d 254, 261, 263 (6th Cir. 2003) ("[p]olice promises of leniency and threats of prosecution can be objectively coercive," particularly if they cannot be "lawfully executed"); cf. *State* v. *Griffin*, 339 Conn. 631, 711–12, 262 A.3d 44 (2021) (*Ecker, J.*, concurring in part and dissenting in part) (recognizing that there is nothing improper about giving "[a defendant] an accurate statement of the law, consistent with the known facts of the [crime]," but that falsehoods intended to misrepresent law are coercive), cert. denied, U.S. , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022).[12]

The majority relies heavily on the officers' "free to leave" commentary as a significant indicator that a reasonable person in the defendant's position would have believed that he was, in fact, free to terminate the inter-

rogation and to request an escort out of the building. I believe, to the contrary, that the comments conveyed— and were intended to convey—precisely the opposite meaning to the defendant. Because the defendant was told that he could not end the interrogation without suffering a significant adverse consequence (arrest for the victim's murder), LaMaine's statements taken as a whole actually exacerbated, rather than mitigated, the coercive nature of the police-dominated environment. See *United States* v. *DiGiacomo*, supra, 579 F.2d 1214; *United States* v. *Blakey*, supra, 294 F. Supp. 3d 494; see also, e.g., *United States* v. *Czichray*, 378 F.3d 822, 825 (8th Cir. 2004) (threats of arrest are relevant to custody analysis), cert. denied, 544 U.S. 1060, 125 S. Ct. 2514, 161 L. Ed. 2d 1109 (2005); *State* v. *James B.*, 129 Conn. App. 342, 347, 19 A.3d 264 (2001) (same), cert. denied, 302 Conn. 910, 23 A.3d 1248 (2011).

The majority acknowledges that threats of arrest "may have an effect on a reasonable person's perception that he is free to leave" but concludes that the threats of arrest in the present case would not have led the defendant to believe that he "was restrained to a degree associated with a formal arrest" because the defendant was told he would be arrested in the *future* but was not under arrest *now*. Footnote 12 of the majority opinion. The majority's conclusion regrettably sanctions yet one more transparent ploy for the police to evade the requirements of *Miranda*: simply inform the suspect that, if he chooses to remain silent, his freedom will end tomorrow rather than today. By approving this technique, the majority ignores the plain fact that an explicit threat of an impending future arrest will dilute or even altogether eradicate the significance of advisements that a person is free to leave. Its claim is unsupported by case law and contrary to common sense. It cannot seriously be maintained that a threat by the interrogating officers to arrest a suspect in the near future, but not right now, unless the suspect remains and answers questions will have no significant impact on the person's perception that he is truly free to leave. In addition to the other factual circumstances discussed at length in this opinion, the interrogating officers informed the defendant that they had sufficient evidence to arrest him for the victim's murder and that they would procure an arrest warrant if he terminated the interrogation or refused to tell his side of the story. Given the officers' use of "incriminating information *against* [*the defendant*]" and threats of arrest to "leverage their authority over [him]," I believe that a reasonable person in the defendant's position would have perceived his freedom of action to have been restricted to the degree associated with a formal arrest. (Emphasis in original.) *United States* v. *Panak*, 552 F.3d 462, 469 (6th Cir. 2009). Accordingly, the defendant's inculpatory admissions in his first interrogation should have been suppressed.

The state appears to argue that the admission of the

defendant's statements in his first interrogation, if improper, was harmless because the defendant's statements in his second interrogation, which was preceded by *Miranda* warnings and in which the defendant made the same inculpatory admissions, properly were admitted into evidence. I cannot agree. As I previously explained, in *Missouri* v. *Seibert*, supra, 542 U.S. 600, the United States Supreme Court held that the police could not evade the requirements of *Miranda* by engaging in the "question first" stratagem of eliciting an unwarned confession before administering *Miranda* warnings, and then eliciting the same confession again, unless "a reasonable person in the suspect's shoes would . . . have understood [the *Miranda* warnings] to convey a message that [he or] she retained a choice about continuing to talk." Id., 617 (opinion announcing judgment). The court in *Seibert* enumerated five nonexclusive factors to determine whether the bifurcated procedure will pass constitutional muster in any particular case: "[1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first." Id., 615; see *State* v. *Donald*, 325 Conn. 346, 360 n.8, 157 A.3d 1134 (2017) (acknowledging that *Seibert* was "plurality" opinion but nonetheless adopting its analysis to assess admissibility of second warned confession).

I conclude that the *Miranda* warnings administered prior to the defendant's second interrogation were constitutionally ineffective under *Seibert*. The defendant's second interrogation was comparable in length to the first interrogation and occurred approximately five hours later at the Bridgeport police station. The interrogating officers, Curet and Detective Robert Winkler, treated the second interrogation as a mere continuation of the first. Indeed, at the commencement of the second interrogation, Winkler informed the defendant that they were just seeking to "continue the conversation that [the defendant] had" earlier that day "to work out a couple more details on this." As the majority recognizes, "[f]or the most part . . . during the second [interrogation], the police officers asked the defendant to review the account he had provided to them during the first [interrogation]." Under these circumstances, the second interrogation clearly was not "distinct from the first, unwarned and inadmissible [interrogation]," and should have been suppressed.[13] *Missouri* v. *Seibert*, supra, 542 U.S. 612 (opinion announcing judgment).

Taken together, the circumstances surrounding the questioning of the defendant do not permit me to conclude that the defendant voluntarily subjected himself to a ninety minute police interrogation at the end of his mandatory probation meeting. It is especially troubling

that the majority reaches the opposite conclusion with no suggestion of disapproval as to the coercive and deceptive interrogation methods employed by the police officers in this case. Indeed, it appears to normalize deliberate and strategic coercion and manipulation as a feature of police interrogation by explicitly acknowledging that "[i]t is undeniable that the defendant was questioned in a coercive environment" but concluding that "a coercive environment, without more, does not establish that an interrogation was custodial." Text accompanying footnote 12 of the majority opinion. The coercive pressures applied to the defendant in the present case far exceeded those that are inherent in the power differential between interrogator and suspect. See, e.g., *Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (recognizing that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it"). The pressures felt by the defendant were not merely the result of coercion in the air—the ambient and unavoidable dynamics inherent in the power imbalance that exist any time armed police officers interrogate a private individual. Instead, the coercion was deliberately created and directly applied to the defendant, with the intent to manipulate and pressure him to confess to the crime under investigation. It is not too much to require police officers, at the very least, to advise a suspect of his constitutional rights, as prescribed by *Miranda* and its progeny, before undertaking such an interrogation. Our decision today gives police officers an incentive to evade the requirements of *Miranda* merely by telling a suspect that he is free to leave but explaining why doing so will result in his arrest.

The simple truth is that such methods ultimately do great harm to the very legal order put forward to justify those methods in any given case. No public good is served when we reward official coercion accomplished by sly techniques designed to evade constitutional principles. Our approval of such methods reflects badly on the criminal justice system and, over time, erodes public confidence in the fairness and legitimacy of the process. The only positive news is that it remains an open question whether the state constitution provides broader prophylactic protection in this context. See *State* v. *Purcell*, 331 Conn. 318, 321, 203 A.3d 542 (2019) (adopting "a more protective prophylactic rule" for *Miranda* rights under state constitution). Because the defendant did not raise an independent state constitutional claim on appeal, we must leave the resolution of that issue for another day. See footnote 3 of the majority opinion.

For the foregoing reasons, I believe that the defendant was in custody at the time of his first interrogation and entitled to the full panoply of protections prescribed by *Miranda*. Because the defendant's inculpatory statements should have been suppressed, I respectfully dissent.

[1] The trial court did not find that Calixte informed the defendant that he had a choice to decline to attend the meeting in her supervisor's office, and the record reasonably cannot be construed to support such a finding. At the suppression hearing, Calixte testified that she "basically let [the defendant] know the office visit was concluded. We were done, and we were walking downstairs, but, if he had a moment, he can speak to someone else who would like to talk to him." The following exchange then occurred between Calixte and defense counsel:

"[Defense Counsel]: Do you recall whether or not you gave [the defendant] any choice to . . . .

"[Calixte]: There's always a choice. Of course, I gave him a choice.

"[Defense Counsel]: You told him . . . I'm going to take you downstairs now, okay. My supervisor wants to see you, but you don't have to see my supervisor. Is that your recollection?

"[Calixte]: I don't recall. I don't recall."

By far the most reasonable construction of Calixte's testimony, viewed in its entirety, is that she could not recall whether she informed the defendant that the downstairs meeting was not mandatory. Immediately following her mid-question declamation, in which she cut off counsel to explain that there is "always" a choice, Calixte was asked directly if she told the defendant that "[m]y supervisor wants to see you, *but you don't have to see my supervisor*." (Emphasis added.) Her answer: "I don't recall." Indeed, she emphasized that she did not recall what she told the defendant by repeating the concession twice. As discussed in more detail later in this opinion, in the absence of an advisement that the meeting was optional and that there would be no adverse consequences for declining to attend, a reasonable person in the defendant's position would not have believed that he had a voluntary choice to refuse to comply with Calixte's suggestion.

[2] No such evidence was adduced at trial, and it appears that LaMaine lied to the defendant regarding the existence of the evidence to induce a confession. I recognize that, in *Oregon* v. *Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977), the United States Supreme Court held that such factual misrepresentations have "nothing to do with whether [a defendant] was in custody for purposes of the *Miranda* rule." Id., 496. But see id., 497 (Marshall, J., dissenting) (recognizing that defendant would not feel free to leave during questioning "after being told by the police that they thought he was involved in a burglary and that his fingerprints had been found at the scene"). I am, of course, "bound to accept the law as formulated by the Supreme Court of the United States" to resolve the defendant's federal constitutional claim; (internal quotation marks omitted) *State* v. *Dickson*, 322 Conn. 410, 472 n.11, 141 A.3d 810 (2016) (*Zarella, J.*, concurring in the judgment), cert. denied,      U.S.      , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017); and, therefore, I am required to agree with the majority that LaMaine's factual misrepresentations during the first interrogation have no bearing on the *Miranda* custody analysis. But see footnote 6 of this opinion. My own view is that we know a great deal more about false confessions today than we did forty-five years ago, and Justice Marshall's dissent in *Mathiason* has been proved prescient. As I explained in my concurring and dissenting opinion in *State* v. *Griffin*, 339 Conn. 631, 262 A.3d 44 (2021), cert. denied,      U.S.      , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022), "lying to suspects about evidence against them contributes to false confessions" by making suspects "feel trapped by the inevitability of evidence against them." (Internal quotation marks omitted.) Id., 730–31 (*Ecker, J.*, concurring in part and dissenting in part). Because such deceptive interrogation tactics contribute to the coercive nature of an interrogation, they should factor into the custody analysis.

[3] For example, a suspect may not be free to walk away from an interrogation conducted in his or her own home, or while incarcerated, or during the course of a traffic stop or other lawful detention. See *United States* v. *Faux*, 828 F.3d 130, 135–36 (2d Cir. 2016) (recognizing that suspect might not feel free to leave or terminate interrogation conducted in his or her own home, but nonetheless not all in-home interrogations are custodial for purposes of *Miranda*); see also *Maryland* v. *Schatzer*, supra, 559 U.S. 113–14 (same for interrogation of prison inmate); *Berkemer* v. *McCarty*, supra, 468 U.S. 437 (same for interrogation during traffic stop).

[4] Ironically, it is the majority that collapses the custody inquiry and that fails to attend to the second part of the two part analysis prescribed by *Howes*. In lieu of asking whether the circumstances surrounding the interrogation present the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*, the majority skips that inquiry and

substitutes a different one. The substitute, which is repeated with talismanic reverence dozens of times by the majority, disregards the coercive pressures prong and focuses solely on whether the defendant was subjected to restraint to a degree associated with a formal arrest. The majority's analytical shortcut results in a tautology by asking the ultimate question first. A reviewing court cannot determine whether the restraint on a suspect's freedom of movement rose to the level of a formal arrest without first asking whether the pressures brought to bear on a suspect were the same type of coercive pressures against which *Miranda* was designed to protect. Stated simply, the "restraint to a degree associated with a formal arrest" inquiry is the end product of the two part analysis, not the predicate question. To determine whether a suspect was restrained to the degree associated with a formal arrest, a reviewing court must ask whether the totality of the circumstances (physical *and* psychological) would combine (1) to lead a reasonable person in those circumstances to believe that he was not free to leave or terminate the interrogation, and (2) to give rise to the same type of inherently coercive pressures as the station house questioning at issue in *Miranda*.

[5] The majority denies applying the *Mangual* factors in a "mechanical" fashion; footnote 14 of the majority opinion; but I find that the majority's rote recitation of each *Mangual* factor, followed by a conclusion as to whether that individual factor is "the functional equivalent of a formal arrest," obscures and frustrates the goal of determining whether these factors—in their totality—combine "to present a serious danger of coercion" for purposes of *Miranda*. (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 193. Although some of the *Mangual* factors standing alone may be insufficient to establish that a suspect was in custody, it is important to remember that the factors are not exclusive, none of the factors stands in isolation, and the essential issue remains a wholistic assessment of the nature and degree of coercive pressure that a reasonable person would have felt under the circumstances.

Numerous courts and commentators have cautioned against the dangers that attend the mechanical application of multifactor tests. "Although multifactor tests are ubiquitous, they are imperfect. . . . When judges excessively rely on multifactor tests . . . there is a risk of mechanical jurisprudence," which "may unduly restrict judges from tailoring their analysis to the case." C. Guthrie et al., "Blinking on the Bench: How Judges Decide Cases," 93 Cornell L. Rev. 1, 41 (2007); see, e.g., *Daniels* v. *Essex Group, Inc.*, 937 F.2d 1264, 1271 (7th Cir. 1991) (observing that Seventh Circuit has declined to adopt multifactor test in Title VII sexual harassment cases because of "the potential for a mechanical application that overlooks or underemphasizes the most important features of the harassment inquiry").

[6] LaMaine admitted at the suppression hearing that he did not, in fact, have probable cause to obtain a warrant for the defendant's arrest at the time of the first interrogation. True or false, the threats of arrest plainly were intended to have a coercive effect on the defendant's choice to terminate the interview. See, e.g., *United States* v. *LeBrun*, supra, 363 F.3d 721 (deceptive interrogation tactics are relevant to custody analysis if "a reasonable person would perceive the coercion as restricting his or her freedom to depart"); see also *Berkemer* v. *McCarty*, supra, 468 U.S. 442 ("the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation").

[7] The majority states that the defendant failed to fulfill his burden of establishing that he was in custody, in part because there is no evidence in the record that "there were any limitations placed on [the defendant's] ability to leave the secured areas of the building or the building itself." The assertion is arguable but very weak. The undisputed evidence in the record established that the area of the building in which the interrogation took place was locked, secured, and required an escort. At the end of the interrogation, moreover, LaMaine can be heard asking "if Pete's there," presumably referring to whether Peter Bunosso, the Chief Probation Officer, could escort the defendant out of the secured area of the building. I am unaware of anything in the record that would support a contrary factual determination. Arguably, in the absence of a specific finding by the trial court on this issue, the record does not permit us to conclude *with certainty* that, although the defendant clearly was required to be escorted to his meeting, he was not required to be escorted out of the building after his meeting ended. See, e.g., *Small* v. *Commissioner of Correction*, 286 Conn. 707, 716, 946 A.2d 1203 ("[w]hen the record on appeal is devoid of factual findings . . . it is improper for an appellate court to make its own factual findings"), cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d

336 (2008). But, based on the undisputed facts regarding the extent of security in the building, specifically, the requirement of an escort from the entrance of the building to the defendant's meeting with Calixte and the fact that Calixte escorted the defendant to Bunosso's office, a reasonable person in the defendant's position would have believed that he could not leave without assistance.

[8] As a separate matter, I have serious concerns about the role that the Office of Adult Probation played in the interrogation of the defendant. Probation officers act under the auspices of the Judicial Branch in requiring the defendant to submit to the conditions of probation. See *State* v. *Jacobs*, supra, 229 Conn. 393 ("the probation process operates as an arm of the judiciary, not of the police or prosecution"); *State* v. *Fuessenich*, 50 Conn. App. 187, 199, 717 A.2d 801 (1998) ("when a probation officer demands a probationer's compliance with a condition of probation, he or she is acting as a representative of the [J]udicial [B]ranch and not as a police officer"), cert. denied, 247 Conn. 956, 723 A.2d 813, cert. denied, 527 U.S. 1004, 119 S. Ct. 2339, 144 L. Ed. 2d 236 (1999). Because probation officers are representatives of the Judicial Branch, rather than law enforcement, their involvement in actively facilitating police access to probationers, within the probation office itself, for the purpose of furthering a criminal investigation threatens to impair the public perception of their neutrality.

[9] The majority states that the record is ambiguous "as to whether Calixte informed the defendant that he was not required to attend" the meeting and that "[i]t defies logic, when confronted with an ambiguous record, to draw the inference favorable to the party who bears the burden of proof." Footnote 13 of the majority opinion. The record may be ambiguous regarding Calixte's precise statements to the defendant, but the record is unambiguous with respect to the conditions surrounding the defendant's interrogation, including the fact that the defendant was escorted to a locked and secured area of the building—where he was not permitted to move about freely and where he was questioned in a closed room by two armed police officers. These facts, when considered in combination with the other psychological factors at play in the probation context, clarify any ambiguity in the record regarding whether a reasonable person in the defendant's position would have believed that he had a real and meaningful choice to attend the meeting in the office of Calixte's supervisor.

The majority relies on *Minnesota* v. *Murphy*, 465 U.S. 420, 438, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984), to conclude that the defendant's fear of revocation of his probation was unreasonable "because 'the [s]tate could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the [f]ifth [a]mendment privilege' . . . ." Footnote 13 of the majority opinion. Critical to the United States Supreme Court's holding in *Murphy* was the fact that the conditions of probation at issue in that case did not require the probationer to answer the probation officer's questions. See *Minnesota* v. *Murphy*, supra, 438. The federal courts of appeals have recognized that the rule articulated in *Murphy* is not controlling when a probationer is required as a condition of probation to comply with a probation officer's directives and answer questions truthfully. Under those circumstances, it is reasonable for a probationer to believe that the refusal to answer questions would result in a revocation of probation. See *McKathan* v. *United States*, 969 F.3d 1213, 1228 (11th Cir. 2020) (concluding that reasonable person on federal supervised release would understand that he could be punished for his "refusal to answer his probation officer's questions" and, therefore, that petitioner's statements were obtained in violation of fifth amendment); *United States* v. *Saechao*, 418 F.3d 1073, 1078–1079 (9th Cir. 2005) (rejecting government's claim that "a probationer is subject to threat of penalty only when the state *explicitly* announces that it will impose a penalty for the invocation of his [f]ifth [a]mendment rights" and concluding that probationer's statements were involuntary because he "was required, as a condition of his probation, to 'promptly and truthfully *answer all* reasonable inquiries' " ((emphasis in original)). Because the defendant in the present case was required as a condition of his probation "to cooperate with his probation officer[s]" and to "follow their directions," it would have been objectively reasonable for a person in the defendant's position to fear revocation of his probation.

[10] The majority dismisses the delay on the basis of *State* v. *Pinder*, 250 Conn. 385, 736 A.2d 857 (1999), and *State* v. *Lapointe*, 237 Conn. 694, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996), but the majority's reliance on these cases is misplaced. See footnote 16 of the majority opinion. *Pinder* and *Lapointe* stand for the proposition that a

defendant's inculpatory admissions do not transform a noncustodial interrogation into a custodial interrogation for purposes of *Miranda*. The issue in the present case is not whether the defendant's inculpatory admissions transformed a previously noncustodial interrogation into a custodial one; the issue is whether the interrogation was custodial from the outset and whether the officers' advisements that the defendant was free to leave, given twenty-one minutes after the commencement of the interrogation and *after* eliciting inculpatory admissions from the defendant, would have led a reasonable person in the defendant's position to believe that he was not in custody. The majority has cited no authority for its conclusion that such advisements have a "powerful effect" despite their significant delay, and I have found no authority to support that counterintuitive supposition. Permitting free to leave advisements to have a nunc pro tunc powerful effect would allow interrogating officers to inoculate themselves against the administration of *Miranda* warnings simply by waiting until after a suspect has made damaging admissions to inform him that he is free to leave.

[11] Even unqualified free to leave advisements must be assessed in light of the surrounding circumstances and are ineffective if those circumstances would lead a reasonable person to believe otherwise. See, e.g., *State* v. *Mangual*, supra, 311 Conn. 204 n.16 ("advising the suspect that he was not under arrest and was free to leave was insufficient to support a conclusion that he was not in custody for purposes of *Miranda*"); see also *United States* v. *Hashime*, 734 F.3d 278, 284 (4th Cir. 2013) ("[E]ven to the extent that law enforcement told [the defendant] that he did not have to answer questions and was free to leave, that by itself does not make the interrogation [noncustodial]. Although a statement that the individual being interrogated is free to leave may be highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was in custody, such a statement is not talismanic or sufficient in and of itself to show a lack of custody." (Internal quotation marks omitted.)); *United States* v. *Craighead*, 539 F.3d 1073, 1088 (9th Cir. 2008) ("The mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation [noncustodial] per se. We must consider the delivery of these statements within the context of the scene as a whole.").

[12] As I stated previously in this opinion, LaMaine admitted at the suppression hearing that he did not, in fact, have probable cause to arrest the defendant at the time he threatened to obtain an arrest warrant during the first interrogation. See footnote 6 of this opinion. Again, whether the threat was true or a ploy does not make a difference in the present analysis, in the sense that the issue is whether the defendant would have reasonably *perceived* the threat to be true. See id. Nonetheless, I cannot disregard entirely the fact that LaMaine himself manifestly believed that it was necessary to exert psychological pressure on the defendant to persuade him to remain in the room and talk, by communicating to the defendant false information about the strength of the evidence and his vulnerability to arrest. The point is not that the information was false but that the interrogating officer, by making it a theme of the interrogation, evidently found it necessary to influence the defendant's decision making.

[13] The state also argues that the admission of the defendant's statements during the first interrogation "was harmless because the defendant's statements during [that interrogation] did not amount to a confession." The exclusionary rule, of course, is not limited to outright confessions of guilt. See *Miranda* v. *Arizona*, supra, 384 U.S. 476 ("The warnings required and the waiver necessary in accordance with [*Miranda*] are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements [that] are direct confessions and statements [that] amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination."). The present case illustrates the harmful effects that can result from incriminating statements short of a full confession. The state's case against the defendant was not strong—there were no eyewitnesses to the victim's murder or any physical or forensic evidence implicating the defendant in the crime. In my view, the defendant's admission that he had had a heated argument with the victim, drove to meet the victim, and was present when the victim was shot and killed likely had a profound impact on the jury and contributed to its guilty verdict. Under these circumstances, the admission of the defendant's statements cannot be deemed harmless beyond a reasonable doubt. See,

e.g., *State* v. *Mangual*, supra, 311 Conn. 214 (state bears burden of proving that violation of defendant's *Miranda* rights was harmless beyond reasonable doubt, and erroneous admission of statements procured in violation of *Miranda* is not harmless if it "may have had a tendency to influence the judgment of the jury" (internal quotation marks omitted)).

———————————